Good morning, Your Honor. My name is Peter Buscemi. I'm here with Dan Wolf and Mike Wilson on behalf of the Romero plaintiffs. I'd like to reserve four minutes for rebuttal. Just a procedural question. I take it that the order that was, the tentative order I guess that was put out by Judge Fulham, there were certain issues it did not deal with in terms of like the other release claims, the common law claims, the fiduciary, ERISA fiduciary duty claim. But it looks like the court, what it did was it still granted the motion for summary judgment. I just want to make sure. Is that your understanding as well? If not, then obviously there's a question as to whether we have a final order. Yes, Your Honor. Our understanding is that when the court issued its ruling in June of 07, that ruling which essentially tracked what had been said in the March order was a decision on all matters in the case. The court said that the summary judgment motion by the defendant was granted. The court said the motion to dismiss in the Romero 2 case was granted and the court said that all other motions were moot. And you waited 150 days? Yes. Before filing the appeal? That's right. And nothing more happened? Right. Now… And essentially you can do that because of Rule 58? Yes, and also the provision in Federal Rule of Appellate Procedure 4A7A2 I think it is. Now in this case, all state wanted to terminate its employment relationship with approximately 6,200 agents. We are very… You're very familiar. We're very aware of what was happening here. I suggest you get right to what did the district court do wrong? I think the district court did several things wrong, but I think that perhaps the best way to go through them is to talk about the different claims. Let's talk about ERISA first. Under Section 510 of ERISA, it's unlawful to discharge a participant or a beneficiary in an employee benefit plan for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. What evidence do you have of this unlawful purpose on the part of Allstate? Well, we have a variety of record evidence about what Allstate knew and what Allstate thought. For example, Allstate was asked to save a substantial amount of money in 1999 when this program was adopted. And we know that the record shows that Allstate's own assessment of what it was going to save on an annual basis as a result of this program was approximately $175 million, of which nearly $106 million, more than 60%, was attributable to the termination of employee benefits. So we know we have here very substantial cost savings. We also have... What else do you have? I mean, money helps, but there needs to be something more than that. Right. We also have the avoidance of any future progress toward eligibility for early retirement. So there were some of our clients, for example, who were within days, literally, of achieving their 20 years that they needed for early retirement, and they were precluded from doing that. We also know that the independent contractor option that was made available to the employee agents whose employment was being terminated would have put these former employee agents in, essentially, the position of doing the same work, but simply without benefits. We also know that there was a decision made by Allstate shortly after the initiation of the program to prevent any rehires into any position at Allstate for at least a year, because any rehire in that period would have resulted in the reinstatement of the pension benefits. And we also know that the justifications that Allstate has offered for its program... Allstate says, well, we offered a justification for our program. Well, we know that both of the justifications that they offered have serious holes in them, and we know all that even though we haven't been able to take any discovery. The first justification they offer is, well, our independent contractor program is better than our employee agent program, but they themselves didn't conduct any study of that until after they chose to adopt the program, and when they did conduct the study, the study was full of holes. One page of the study says independent contractors typically have more insurance policies on their books. The other page of the study says, well, employee agents typically have more insurance policies on their books. So they're not even consistent within their study, and their other... Let me ask you a question if I might, because these arguments, of course, are in your brief and are interesting, but one thing that at least has raised a significant question in my mind is, why would these things matter if these claims had all been released? I want to talk to you about the releases for a minute. Your assertion is that on page 59 of your opening brief, this is in Romero 1, is that appellants should be permitted merits discovery about these releases concerning all states' knowledge that it was acting illegally. And my question to you is, there was a 56th affidavit that was filed at one point, but did you in that 56th affidavit ever say, this is what we want to inquire about, about the releases. There's information about releases that we think we need to have. We think that there's information that will show that, etc., etc., etc. I think we did, Your Honor. The 56th affidavit is at page 1147 to 1156 of the joint appendix, and we tried to be as comprehensive as possible. It's a long affidavit. Why don't you take me, if you can, or you don't have to do it right while you're standing there, but maybe somebody could find for you where in that 56th affidavit you said, we're worried about these releases. This is what we want to know about the releases and the circumstances surrounding them. All right, Your Honor. We'll look. I mean, I have a whole series of things that we did ask for, but on my list here, I'm not sure that I have that one in particular. I know we asked about the adoption of the program. Let's assume for just the sake of discussion right now that it isn't in that affidavit. If you didn't ask for that discovery, then you're not in a position to be saying at this point, as you do in your brief, are you, that that's something you need? Well, Your Honor, I would say that in this case, we had a series of unusual procedures different from what normally happens in civil litigation. We never had merits discovery in this case. Now, Allstate tries to respond in various ways. Allstate says, for example, that when Judge Fulham granted four months for class discovery, there was some material produced that related to the merits as well. Well, that's inevitable in class discovery, but it was quite clear that there was no merits discovery, and we served no fewer than three document requests, and we didn't get any documents that were searched for and found as a result of those requests. We got a dump of the production from the Isbell litigation, but we didn't get merits discovery at any time. So I think what we did— You had the 30B6 witnesses. You had three witnesses, correct? We had one 30B6 deposition in which Allstate chose to produce three witnesses to cover the 30B6 notices, and that was part of the class discovery. Well, what did you do vis-a-vis seeking out the district court's aid? And I know there were problems with respect to getting the district court to act in this case, but what did you specifically do to bring to the attention of the district court the fact you needed merits discovery? Oh, well, there were motions to compel. The motions to compel were on file. They were among the motions that were declared moot in the June 2007 order. Just to finish the point so that it's not lost, the other justification that Allstate tried to make for this program was that they were going to have cost savings because they were going to be able to not have to administer more than one program for their insurance agents. But we know even without merits discovery, their own estimate of what those cost savings were going to be were around $15 million a year. Are you now back to the ERISA specific intent? Well, yes. I was trying to finish my answer to your question, Your Honor, about what we had in addition. Isn't there a difference between specific intent and the standard to show pretext or undermine the legitimacy of a purpose where you have to show that it was a motivating factor? I mean, specific intent is a much stronger evidentiary requirement, is it not? No, I think that's not right, Your Honor. The decisions of this court make it clear that what is meant by specific intent in this context is a conscious decision, and I'll refer the court to the Giacomis case from 2007, to the Gavilic case from 1987, to the DeWitt case from 1997. They all end in seven. And that's the same as Fuentes? Yes, it's a specific intent to take away the retirement benefit, right? It's not some vague consequential this is going to happen as a result of it. I'm going to go in and take it away from you. Well, Your Honor, they put up, they developed slides that said, you know, you've asked us to save $300 million in our sales department. We're going to save $175 million of it by getting rid of these pension and health benefits. I mean, there's no question that they intended to do it. Mr. Buscemi, are there aspects, I think this is getting onto what Judge Ambrose started talking about, are there aspects of this case that the district court did not resolve that require resolution whereby we should send this case back? The answer to the first part of your question, Your Honor, is yes, there are aspects of the case that the district court didn't resolve. The district court, for example, did not address the common law accounts of breach of contract, breach of fiduciary duty at all. And the district court also did not address the claims of the people who did not sign the release. Because as to those people, no reliance on the release would be possible. Now, I should tell. How about the 204G2 claim? Or is that something your colleagues are going to argue? Well, that's in Romero 2. There was no discussion of the 204G2 cutback claim by the court. It's included only in the sense that the motion for summary judgment is said to have been granted. And just to finish the thought, I think that with respect to the estate of Mr. Gaffner, Mr. Gaffner was the one named plaintiff who refused to sign the release. Now, my understanding is that as of Friday afternoon, his estate has reached a settlement with Allstate. But as the court knows from the briefs and the record, there are another 18 or 19 people who refused to sign the release. So the fact that the one named plaintiff who refused to sign has now settled I don't think changes anything. But I did want to bring that to the court's attention. That's important to know. Are there questions? All right. We'll hear from you again on the rebuttal. Thank you, Your Honor. Mr. Ramshaw. May it please the court, Paul Ramshaw for the Equal Employment Opportunity Commission. With your permission, I'd like to focus on the argument we made in the last section of our opening brief and in the bulk of our reply brief, and that is that the Preparing for the Future program violated the anti-retaliation provisions on its face. We know from- What's the prohibited, the protected conduct here? The protected conduct is preserving your rights under the employment discrimination statutes, your ability to sue and seek relief. And when you sign the release, you lose your ability to get the relief and- Does this incentive ever offer anything to their employees beyond standard severance? No, no. The courts have consistently held that once an employee or a group of employees are terminated, that it is then lawful for the employer to offer two levels of benefits and enhance benefits if you sign the release. Since that's the case and what your opponents are pressing on us is that's exactly what we did. What we did is say, sign the release and these are the benefits that you can have. Don't sign the release. You get 13 weeks of pay. We'll see you later. What makes your case different? In fact, reading your brief, it seems that you indicate this doesn't fit a, quote, traditional paradigm. What sort of nontraditional thing are you asking us to do here? Well, we know from the Supreme Court, Johnson controls, Thurston, that with respect to the anti-discrimination statutes, that it's not only unlawful to fire someone because they're old or because they're pregnant. It's also unlawful to put in place a policy saying if you're 60, you can't do this job. If you're pregnant, you can't do this job. And two courts have held that the same thing is true with the retaliation provisions, that it's not only unlawful to fire someone because they file a charge or sue. It's also unlawful to put in place a policy saying either I'm going to fire you if you file a charge or sue or in order to continue working, you have to release your rights under the statutes. And I guess that's where I feel like people are talking past each other here a little bit. I mean, there's no dispute in this record that everybody was getting the ass in this group. Yes. Everybody understands that. Now, the plaintiffs have a problem with that for a number of reasons, but it's not disputed that these people were getting fired, terminated, whatever you want to call it. And so there was nothing about the release that was going to stop that from happening, right? Your theory is that continuing some relationship, not even an employment relationship, an independent contractor relationship, some relationship with the company is a right that people had that somehow was being taken away from them in retaliation for not signing a release. Have I got you right? It's stronger than that. First of all, during the 90s, Allstate decided that it wanted to try to get all of its employees to change to independent contractors. And during the 90s, it invited them to apply to convert. And they did not have to sign a release to do it. When they put this program in place in 1990, they took away two things at once. They took away both their job and their benefits, and they took away the right to apply to convert without signing a release. So that then their options are, if I want to... Now, when you say their right to convert, aren't you putting the rabbit in the hat when you say that? Who said they had a right to convert? That's the point your opponents are arguing, and that the amicus is arguing, and that I'm not understanding your response to. You assume there was a right to continue a relationship. They assert there was no right to continue a relationship. This was a bargain for exchange. And if they didn't want the bargain, they didn't have to take it. Where do you come up with a right to continue the relationship? I'm sorry. I thought I said the right to apply to convert. I agree. It wasn't automatic during the 90s. But it's like Hisham V. King and Spalding. The associates did not have a right to become partners. But they had, as a privilege of their employment as associates, they had a right to be considered for partnership based on their performance and not their sex. How is that analogous here? If everyone's getting fired, how is that the same as coming up for partnership? Because if you signed the release, if you gave up your rights, substantive statutory rights, you could become an independent contractor and continue your career. These were captive agents. The only thing it did was sell all-state insurance. And if they didn't sign the release, they lost their job and their benefits. So your argument absolutely depends upon the premise that there was a right somehow to continue that relationship. Because in the absence of a right, how can there be retaliation? It depends. A right to apply based on performance. Same thing as was true in Hisham. You don't have any case that's ever held this, have you? As far as we know, no employer has tried to do this before. I mean, you have Isabel, and our argument is that Isabel didn't really resolve our claim because they were looking just at the termination. Thank you very much. What did the Eighth Circuit case hold that went unbound? That was on a separate policy about that they would not rehire persons who were fired in this policy, and so it's separate from this case. Thank you very much. Thank you. Good morning. Please, the Court. I'm Rick Gottfried. I represent the Allstate Party Defendants. Let me, if I may, just start off with you on the order that was entered in June of 2007. We talked about, with Mr. Buscemi, of at least three areas, the other release claims that I guess maybe perhaps Mr. Gaffner has settled that. We also talked about the common law claims, and we talked about the ERISA fiduciary duty claims and also the anti-cutback claims for accredited service. It looks to me like I can't find any rationale for why the Court ruled any. Well, the Court, there's a jugular vein issue in this case, which is the release, and the plaintiffs moved for summary judgment on the release before we did. They thought they had sufficient discovery. They moved forward. We went forward. On the release, there was a retaliation cause of action, and the response was that Isbell decides it, which we can talk about. I'm not sure it does. And then on the release, there was other release claims. That would be the one of people who didn't sign, like Mr. Gaffner. There was an ADEA claim, age discrimination. The response was Isbell decided it. Again, I'm not sure that's the case. There was an ERISA 510 case. The response was that the Court, Isbell decided it. Common law claims, like breach of contract and fiduciary duty breaches, no rationale whatsoever. Anti-cutback claims, that is dealing with what I call the beef up. The first response on the beef up was that the 11th Circuit case of Scott precluded it, and then B was the credited service. They didn't get the full credited service when they came back, and there was no response to that. And then the ERISA fiduciary duty claim for credited service, and there was no response to that. Well, if the premise of Your Honor's question is, is this a final judgment? No, but my premise is, how do we deal with something? Why not just send this back to do it right? Well, we don't think this is a final judgment. I'd like to be here, because I think the objectors are being issued. Well, he did say in the order, did he not, that the defendant's summary judgment motion is granted. Yes, but he said more than that. On paragraph 7 of the order, he asked for further briefing, and on July the 10th, 2007. Well, if there's anything I missed, let me know. Otherwise, I'm going to close the case. Right, and the plaintiffs filed a piece of paper. It's in the record. I'm sure we're familiar with it. Okay. And then 150 days passed. Right, and then this court twice issued orders essentially to show cause why the appeal shouldn't be dismissed, and it was referred to this panel after the briefing. The EEOC's position was very candid, and I thought very honest. They told this court in December of 2007 that the plaintiffs were taking an appeal to protect their rights out of an exercise of prudence. But your view is Judge Fulham is awaiting, is writing an opinion? No, my view is. What Judge Ambrose says maybe wasn't touched on? No, my view is that. I'll take that. I would not suggest that at all. In the record, seriously, what could you point us to in the record that gives even the slightest whisper of a hint that something was going to come out of the district court? There's nothing. There's nothing in the record. All I know is. Isn't everything exactly to the contrary? Isn't everything in the record telling us, hey, I'm done now. If you've got anything else to say, knock yourself out. Tell me about it, because if you don't, it's closed. I'm in the unusual position that I'd like to be here on the merits, but I don't think there's a final judgment. But there's nothing in the record except for the elusive nature of the court's opinion where this is not the typical opinion you see from a district court where the judge issues the order. Rule 58. Fifteen appendices in a few pages saying, you know, I think Scott and Swain are just fine. In a case this complex, I've never seen one that gets decided in a two-and-a-half-page order like this. That doesn't touch on things. I mean, the question that was asked is, do we not send this back? And maybe we send this back to say, did you mean it as to everything? And if you did, what's your explanation as to these five things? So maybe it's a combination of is it final, and if not, please decide. Well, we start, for the Allstate Party defendants, we start with the following premise, that it is not clearly the intent of the district court to be done with the case is not clearly evident on the face of the record. I was not happy when I saw the order because I thought, am I going to see more? We submitted papers after the June 20 order. We did as well. When you say it's not clear that the district court was to be done, what was left to be done? Every claim was disposed of, right? Yes. What was left to be done, except for possibly, maybe, the district court would say something as to what somebody might say in the following? Well, there's two orders, actually, at issue here. One is the March 21st order, and the second is the June 20 order. After the March 21st order, the party submitted papers. The plaintiffs listed a laundry list of things they wanted to be done. We responded. I know you are. So the following June, what happens? When I look at the record, I won't be able to speak for anybody else. When I look at the record, I see every claim disposed of purportedly on its merits, whether it's explained or not. Just look at 4A. Defendants' motions for summary judgment, documents number 148 and 150, are granted. Yes. Then it's motion dismissed, granted. I mean, what's left? What's missing is a Rule 58 judgment. Not necessary in the sense that under the new amendment to the rules, we don't have the Griggs problem we had before. And then he ended it with this paragraph where he says, identify further issues. Now, he had done that before. This is not the first time the judge had done that. And time went by, and then an opinion would come out. So we looked at it from the standpoint of, is this final or is it not final? We didn't know. Maybe I am naive. Why are you arguing this isn't final? Well, it's not naivete. It's that I think jurisdiction is a threshold question for the court. I would prefer to be up here and saying it's final and argue the jugular vein issue, which is the release, and I'm very comfortable with that. Why don't you get on to the arguments that you would make? Fine. But Judge Ambrose started with a question on jurisdiction, and I'm not going to defend the opinion as written as an abject lesson in pristine clarity in terms of finality. I can't do that. I'm bothered by that. Two other just procedural questions before we get to the merits. As to the discovery here, this is a very complex case. Even if you deal in this area, it's a complex case. There's a host of issues, a lot of nuances. Four months' discovery, at least in my experience, is woefully short of what you need here. That's not what they got. I think there's been some serious overreaching and departure from the record. I'd like to take one minute on this discovery point. Go right ahead. To answer your question, Judge, and your question. That's fine. Case is filed in August of 2001. 30 depositions are taken of the plaintiffs. 126,000 pages are produced on the merits, both from Isbell and from Scott and from other sources. The first motion to compel was filed in June or May of 2003. It was actually filed June 27, 2003, by the plaintiffs. That's 102 in the docket sheet. Mr. Godfrey, as to what you say we gave these hundreds of thousands of pages, now whether it's fair or not for them to say it, their response to that is that's not what we asked for. We didn't ask for your Isbell discovery. We wanted our discovery. We had our own issues. We posed our own issues. You refused to give us merits discovery on our own issues. So saying that you backed up the trial and gave us another case's discovery doesn't help us. Just to add on to that, for example, they asked for e-mails, and all you gave them was the hard copies of those that were preserved in files. They asked for productivity reports, and you only gave them one. I can't imagine there weren't others. I guess the bottom line question I've got is, as to discovery, are you suggesting that there was full merits discovery in this case of the sort that would typically occur prior to a summary judgment grant? What I'm suggesting is something slightly different. The procedural history of the case is not as advertised. They filed a motion to compel. We opposed it. They lost it. It was part of the September 15, 2003 hearing. In March of 2004, the judge denied it. In 2004, did they do anything on discovery? No. In 2005, did they do anything on discovery? No. The court didn't do anything. The court didn't move it along, and then finally they had a motion to compel. What, in January of 2006 again? No, not in January of 2006, June of 2006. In January of 2006, they filed this affidavit, which, by the way, I looked at in answer to your question. There's nothing in here about the need for discovery on releases, but since releases go to evidence in their possession, they don't need discovery on it. But they didn't seek discovery of the type they're talking about, at least not pointed out in the affidavit. Do you have any idea what caused this incredible delay? No. I've had a number of cases in a number of courts over the years where I've had similar experiences. I'm just a lawyer. I respond to the court orders and the court deadlines. Doesn't the court have to rule on a 56-F motion before granting summary judgment? Isn't that the law? Well, it's embedded in the ruling. If the court's asking me specifically, does the court have to address by saying, I've looked at your Rule 56-F affidavit. It is facially invalid or doesn't persuade me. I'm not aware of a court that has said it in those terms, but it's typical that courts either say something or they don't say something when they issue their Rule 56 opinions. But the affidavit was filed in January of 2006, after we filed for summary judgment in December of 2005, and then only in June of 2006 was the motion to compel filed. Let me ask you, just back on the productivity. By the way, I want to correct one thing. We rather strongly disagree that Isabel's unrelated. The EEOC filed amicus briefs. I understand you've got a different position. No, but when they say that the discovery wasn't the same, no, it was the same. It overlapped. That's why this affidavit is very carefully written to say they want to. They disagree reciprocally with that. Well, but the affidavit's carefully written. It says they want to test. They want further discovery to test. It never once identifies a bucket of materials that would make a material difference. But set all this aside, there's a jugular vein issue here in the merits, which is the validity of this release. Because if the release is valid, then nothing else matters. Even if that were the case, is there really issue preclusion for Isabel? No, we're not arguing issue preclusion. We're saying it's persuasive authority. The EEOC made every one of the arguments in the Isabel District Court that they made to this court. The plaintiff named Carrier here, and this does perhaps go to preclusion, Mr. Carrier sued Allstate in 1999, arguing he had the absolute right to convert from an employee agent to an independent contractor. He lost the case. He took an appeal to the Fifth Circuit, and then it was dismissed for want of prosecution. Going to your point, Judge Jordan, this is a novel, unprecedented retaliation plan that would fundamentally alter the ability to settle a case. I mean, what employer going forward would ever offer enhanced consideration or ever offer something that they don't have to to get a release because it's going to be per se retaliation? But their argument would be that your rationale for what you did, obviously saving money for productivity purposes, the theme being that those who had a book of business tended to service the current customers and not to develop new business. And that's one of the reasons I focus on the productivity study. You only produced one, and they said, well, there's got to be more. If there is only one, it would seem that productivity was not really, or at least they would argue if they ever got to a trial, that productivity was not the real reason because a company like Allstate would have had far more than one productivity study. Two points. Reverse order. First, if we're correct on the release, it doesn't matter. The claim is gone. And secondly, I'm not accepting there's only one study. I've not gone back through the 126,000 pages and said there's only one study on productivity. But if you produced only one. No, no. My point is I don't believe that's correct. There was abundant materials that were at the district court that we produced from Isbell because that was one of the issues in Isbell, and the Isbell court squarely considered and ruled that the legitimate business reasons that Allstate had for doing what it did was an independent defense regardless of the release. Now, what's unusual about this, and Judge Jordan, you commented on it earlier, this isn't a case where in a decisional unit we had a riff where we took out 10%. And so the question is which 10% did we take out and why, or 20%. Everyone was terminated. And they were terminated, and then four options were given, three of which were the most extraordinary transfer of wealth I've ever seen in an employment discrimination case. There was over $182 million in cash severance paid to these people on top of books of business. The average amount paid to these plaintiffs, not including the value of their book of business, was $282,500. Mr. Carrier's book of business, which was transferred to him, was worth over $3 million alone. They signed a release. It bars all of these claims. Now, if the release is valid. Let's take a counterfactual because I take this to be the gist of the argument from the EEOC, which is that you did in two steps what you could not have done in one, and that we're being asked to elevate form over substance here. You could not have said to people, we're going to fire you unless you sign a release. So what you did was fire everybody and then said, if you sign a release, you can keep working with us. Not what we did. Well. It's not the facts. Is it? Well, I know it's not the facts. That's why I started by saying it's a counterfactual. So respond to the assertion that they're making, which is that shouldn't matter as a legal matter. It shouldn't make a difference whether an employer is clever enough to say, I'll fire you all, and then I'll hire you back maybe, or to say, sign this or fire you all. That was the hypothetical that they postulated to the court in Isbell that the Seventh Circuit did not accept either. One, it is counterfactual. But two, in that situation, you are taking action directly against an employee, and presumably there must be some protected activity in there. That is, that the employee is making a charge or about to make a charge. Here, there's no protected activity. They were simply terminated. There was no adverse action causally related to it, and there's no causation. I mean, they fail on all three counts. The Sundance case out of the Sixth Circuit, the Graves v. Fleet Card case out of the Sixth Circuit, both of which they say were wrongly decided, but this argument that they have been making, and the Amikai brief that was filed here points out that the EEOC has been making this argument repeatedly. Every court that faced it has rejected it repeatedly, and the reason they've rejected it is precisely the one you put your finger on, Judge Jordan. I'm just asking a question. Well, but I think the question was the right question. I'm an employer. I'm going to have a riff. I now know the Allstate case has been decided adversely to Allstate in the Third Circuit, counterfactual. Let's assume that for the sake of argument. Why would I ever give them anything? I'll just fire all of them because I am worse off if I try to do the right thing by offering them enhanced severance, by trying to give them benefits they would otherwise never get, but I would be on a fool's errand if this court were to adopt the position of the EEOC. I would be hurting the very people they're designed to try to protect. Now, what's interesting about Isabel, because every one of the arguments that was made here was made in Isabel, by the EEOC and or Doris Isabel or Mr. Schneider. Isabel did not sign the release, so she's one of the 19 out of the 6,331 people who didn't sign the release. Schneider did sign the release. It covered both sides. You know what's funny about this appeal about setting aside the jurisdictional question, threshold question? We've got 6,304 people or something that signed the release, had a huge wealth transfer, and except for one paragraph in his brief, the EEOC only wants to talk about the 15 or 18 who didn't sign it as though they drive the bus, none of whom had filed a charge, none of whom were engaged in protected activity, none of whom would have been treated any differently whether the release was offered or not because they were all being terminated. But the argument being made by the other side to some extent is if you flip what you said, you said, okay, fine. If you rule against this, who's going to want to engage in this type of program where we hire people back? We'll just fire all of them. Their argument is that if this release were held to be valid, what would prevent Allstate from never being liable for anything ever again? They could just terminate employees and rehire any time they're subject to a release, subject to there being a ñ anytime they think that they anticipate new liability. That's their biweekly paycheck extreme hypothetical, which is divorced from the facts of the record. And if that was the case, we'd have to determine and then we'd have to be a very precise statutory analysis. What is the protected activity? What is the adverse employment action? But ultimately, the concern they have is a balance. You want to make sure that the retaliation statutes are not meaningless. Of course. And nothing in this case will change that. I mean, what they're asking this court to do is a part company with the Seventh Circuit. What their position fundamental ñ they're afraid to say it because they were there in the Seventh Circuit. They were there in the district court. But what they want this court to say is that the Seventh Circuit got it wrong. That's why when they say this court, these arguments ñ When you say that, you mean ñ The EEOC. Right. Well, isn't there ñ isn't your issue that the ñ your view is the consideration for the release. Yes. Is not the ñ it's the ability to have this book of business. It's the money. It's all of these things. It's not just a hiring versus not hiring. Precisely. It's not just the opportunity. I mean, the hypothetical, Judge Ambrose, that you're asking me about, and I think that Jordan, you were as well, goes to this. The consideration, which I doubt would be a valid consideration, is you get to keep your job. Here, they didn't have a right to become an independent contractor making more money. They didn't have the right to the book of business at all. Very valuable. They didn't have the right to the $5,000, debt forgiveness, enhanced severance. They had none of those rights. This is extraordinary consideration that makes it fundamentally different. I think the hypothetical fails not just because it's counterfactual. I think the hypothetical fails because there's no consideration for that. What's the consideration? Let me ask a question about the merits, if I might. I understood from the briefing of the Romero 1 plaintiffs that the assertion is you actually took vested – you took benefits away from people that they were on the verge of receiving and that, therefore, this was not just a termination of something that might have happened out in the future. They actually had accrued years in service under a program, and that that made what you were doing here plainly fall within 502. What's your response to that? There's no allegation in the complaint that accrued benefits that had already vested had been taken away. Now, the fact of the matter is that when one is cleverly phrasing it, it's not yet accrued, but within days, I might. If you're going to terminate 6,200 people, some of whom have been long-time employees, by definition, some might be near a date that matters. The fact of the matter is that's proof that we didn't look at it that way. We made a business decision that they were going to terminate everyone in the business unit. It was not designed to deprive anyone of any particular benefits. But the fact that someone a month from now might have reached a benefit had they continued as employees is no different than if that person had been fired for malfeasance or anything else. Well, and it was an early retirement benefit, so presumably if they were 52 and this was happening at 53, you don't know whether they would have taken that early retirement. You know, my father died at 52. He was entitled to early retirement benefits a year and a half later. That's just the way it is, and that's unfortunate for an individual, but it doesn't make a deal legal. It doesn't give them a cause of action. But on the space, the concern here is that you've got all these people that have invested their professional lives in building a book of business. Which they did not own, which they had no rights to. As long as they were an employee. As long as they were an employee, yes. I didn't mean to interrupt you. No, but the point is they've got so much invested in it. I mean, at some point the argument is that it's coercive because they have to stay. This is how they make their living. Well, can I answer? Sure. I could discuss this all day. So it does not meet the financial duress test. When we took the depositions of these people, and this was before Judge Fulham, when they moved for summary judgment on the validity of the release, keep in mind, they did it. They teed it up first. They fully understood. They knew what they were getting. They took the money. Some of them retired, had a very nice retirement. Some of them continued being independent contractors. You'd have to look. If the question was, is an individual looking at it, that I had to do it or not, that's not a class issue, number one. But on the record before the court, there was a boatload of money transferred. They all signed it. They all had the rights under the OWBPA. They could have revoked it, and they didn't do it. They took the money. They cashed the checks. They got the books. But how do you distinguish, for example, the Bergstein case, which talks about there being, could be a breach of fiduciary duty? Yes, they didn't have necessarily the expenditure of time issue with regard to building up the business. But if they put money into it, there's a duty that's owed to them, the court said. The RA-30 and R-1500 contracts have been interpreted by five federal courts of appeals as termable at will, they're not fiduciary duty contracts. There's law on this. Again, it does not bind this court. I'm not telling this court you're bound by Isbell or bound by Swain. It's just we believe it's persuasive. If there's any further questions, I'd be happy to. I actually do have one that I'll be asking Mr. Semi this too, but didn't in the opening round. So I'll give you sort of a first crack at it. What they make the argument that they should have discovery about what was going on. This goes back to the issue of discovery into the releases. And he's very kindly been forthcoming and told us that the one gentleman who was a name plaintiff, I mean a name plaintiff who didn't sign was passed on, but that there were others in the mix, 18 others, who didn't. My question to you is and will be to him, how is that subject to discovery in class actions? Are the individual needs or individual issues surrounding each release something that is amenable to decision and discovery in class actions? It's not in a class setting. Why not? Once you get into whether the release was willing or voluntary, once you get into Judge Ambrose's question about whether an individual agent made investments or put certain time that was different, once you got down that individual path, then you are inherently talking about the individual decisions of each individual person about whether or not to sign the release and what considerations led them to sign them. I took 19 of the plaintiff depositions in this case. My partner took the other ones. The stories were remarkably different for each person. I had a guy who sent an email to his fellow agent saying with the $600,000 I got, I'm a happy camper, I'm retiring. Still a plaintiff in the case, but it was an interesting email. I got another guy who says, yes, my book of business is worth $3 million, but I'm mad. I still want to be an employee. Counterfactual. He became a millionaire because of the release, but he's still suing us. He wants his cake and he wants to eat it too. That is all on a class basis, not appropriate for class certification. But go back to the release issue where you started in terms of discovery. Unless I've mistaken something because I've been looking at it when I was sitting here. I can't find anything in the Rule 56 FDA about releases, but there's a good reason for that. They jumped the gun. They moved for summary judgment against us on the releases. Then they did it after the discovery, and the knowledge about the releases being voluntary or not, that's all within their control. It's all what they did. Unless the court has any further questions, I appreciate the court's time. It's always a privilege to be here. Thank you very much. Your Honor, I just would like to make a few points in rebuttal. First of all, I think that Mr. Godfrey misspoke. The EEOC, in fact, as they report to the court in their brief, was denied leave to participate as amicus in Isbell. They sought it and they were denied it. Secondly, on the question of discovery with respect to the releases, I was slow on the trigger in response to your question, Judge Jordan. The answer is that we had moved for partial summary judgment with respect to the releases, and at the time of all states' summary judgment motion, our motion had been granted, and Judge Fulham had said that the releases were not valid. So we had no reason to include in our 56F affidavit a request for further discovery with respect to the releases. Well, let me ask you then. After he came out with his March order and said, I was wrong, between then and June when he invited you to say something about it, there was no 56F affidavit, wasn't there? There was nothing that I could see in the record where you came forward and said, well, hold on, if you're changing your mind about the releases, we need to look into that. Well, Your Honor, I think it's important that you also focus on what all states' motion was. I understand it. All states' motion for summary judgment was merely to reverse that decision that Judge Fulham had made in response to our motion for partial summary judgment. So the all states' summary judgment motion did not address any of the other aspects. Aren't you walking into a trap by saying that? Because then you're back to the question, if that's the case and the court granted that, then maybe we don't have a final order. Well, you know, Your Honor, I understand what you're saying, but we can only go by what the court said. The court said, and I looked at the order again while I was sitting at counsel table, both in March and in June, the court said that it had reached some tentative conclusions and invited counsel to submit briefs before the court issued a final ruling. And then this was the final ruling in June. So the court has so characterized the document. That's all I can say in response to your point. Why don't you respond to the two things that Mr. Godfrey talked about with respect to the release. One is, in response to my question about, is this something you could have in a class action anyway? If you have 19 people who didn't sign, as for those 19 people, how could you say, you know, well, the reason they didn't sign is something that is subject to resolution on a class basis? And second, the assertion with respect to the releases that – well, I apologize. Go ahead. Take the first one first. If I've got time and my colleagues let me, I'll ask the second. I think the answer to that question, Your Honor, is straightforward. That is, Wall State can't rely on the releases for the people who didn't sign them. So we don't need to take discovery about the reasons that they didn't sign them. Wall State is talking about the reasons that people did sign them. But our point is that you can look at the objective facts about what the situation was that Wall State posed to these people. They were told, sign or lose your job, number one. Number two, sign or lose – They were told, sign or lose your job? I thought it was undisputed on this record that they were told, you're all fired. You're no longer employees. We no longer have any employees. I take your point. I'll use somewhat more precise terms. They were told, sign or you may no longer be affiliated with Wall State either as an employee or as an independent contractor. The point here, Your Honor, is that for 10 years, starting in 1990, Wall State was trying to persuade these people by suasion to move from employee status to independent contractor status. Wall State had failed. Now they said, you can move into independent contractor status if you want to if you sign this release. If you don't sign the release, you're out as an employee and you're out as an independent contractor. You terminate all affiliation with Wall State. They didn't want to fire all these people and send them out on the street. They wanted them to convert to independent contractor status, which is what they had wanted all along. They hadn't hired an employee agent since 1990. Sure, but if they, as a legal matter, say, we're prepared to accept the risk that many of you won't accept this, we're still canning everybody. Because, as you just said, we've been encouraging people to move over. It's not happening at the rate we want, so you know what? You're all gone. If some of you want to come back, here's the basis on which you can come back. Your Honor, your point is correct, but they knew what was going to happen because it's in the record, again, without discovery that they made predictions that virtually each and every person was going to sign this release because they couldn't do otherwise, and that's why out of 6,200 people, you had only 19 who didn't sign. So they were right. If that's the case, what is the illegality in their saying, we're going to offer you such a good deal, 99.9% of you are going to likely be able to take it? Is there something bad in a deal so good that virtually everybody wants it? Well, you know, your Honor, I'm happy you asked that question because I know Mr. Godfrey wants to portray Allstate as some sort of Iliya Masinari institution that's giving out all these good deals, but that's not the proper characterization. They offered them such a tremendous threat of being out on the street with no way to earn a living that they had no choice but to sign the release. They were told you can't sell for us anymore and you can't sell for anybody else either because you've got to non-compete. You can't even talk to your former customers and sell them lawnmowers because we're not going to allow you to do that either. Is the issue with the release a matter of fact or a matter of law? We think that the release is invalid as a matter of law, but we think that at a minimum, there's a factual issue on the question of whether the legal standards for voluntariness, for whether this is a part and parcel of a wrongful plan in the first place to get rid of people who had employment protections in their contract, and I disagree with Mr. Godfrey about at least the RA30 contract and even the 1500 contract when it's taken together with the manual has employment protections. It's not a pure at-will contract, and indeed, all state has lost that issue in the Linker case in the appellate court in Illinois, the state court in Illinois. But every federal appeals court can look at it. In fact, every federal court can look at it. It's come to the opposite conclusion, right? I think, Your Honor, if you look at the Linker decision, the Linker… But Linker was state law. I'm sorry? Linker was state law. Linker is state law. So my question is, my understanding is, and I'm asking you to correct me if I'm wrong, every federal court that's looked at it has come to the opposite decision of the state appellate court in Illinois, right? But this is a state law question, Your Honor. I mean, this is our common law contract claim, so it is a state law question. And I think the reason that I mention Linker in particular is because Linker goes through those federal appellate decisions point by point and explains where they fell short and what they didn't consider. So we think that there's a serious issue there. But we think that, at a minimum, there's a factual issue on whether these releases are proper. We think they're improper as a matter of law because they're part of an illegal plan. All right. Thank you very much. Thank you, Your Honor. Counsel will take it under advisement. We would ask the parties to arrange for a transcript to be made of this argument. You can consult the clerk's office, and if you could split the fee, we would appreciate it. It's an important and complicated case. Thanks, Your Honor.